**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Hunter J. Garrett, Individually,** | : | |
| | : | |
| **Plaintiff** | : | **Case No.  2:19-cv-2227** |
| | : | |
| **v.** | : | **Judge:** |
| | : | |
| **Opportunities for Ohioans with** | : | **Magistrate Judge:** |
| **Disabilities** | : | |
| | : | |
| **and** | : | **Complaint** |
| | : | |
| **Kevin L. Miller, in his official capacity,** | : | |
| | : | |
| **Defendants** | : | |

## I.     INTRODUCTION

1.      Each paragraph in this Complaint incorporates all others.

2.      This case involves the efforts of Hunter Garrett, a young man with Autism, to receive support from Ohio's state vocational rehabilitation agency, Opportunities for Ohioans with Disabilities ("OOD"), Bureau of Vocational Rehabilitation ("BVR"), for a program that supports college students with Autism to be successful in college and in preparing for competitive and gainful employment.

3.      Hunter applied to OOD for vocational rehabilitation services as a high school senior, and subsequently enrolled as a freshman at Western Kentucky University, as well as the University's Kelly Autism Program, which provides supports specifically designed to address the challenges faced by students with Autism Spectrum Disorder so that they are successful in college and in finding and obtaining gainful employment when they graduate.

4.      Both Hunter and OOD agreed that OOD would support Hunter in his employment goal of graphic design, including the postsecondary degree that he would need to ultimately

obtain his employment goal.

5. However, when Hunter requested that OOD support his participation in the Kelly Autism Program as a vocational rehabilitation service necessary for him to prepare for and obtain competitive and gainful employment, OOD informed Hunter that it would not support his participation in the Kelly Autism Program.

6. Hunter was told that OOD does not support such programs as the Kelly Autism Program, based on a provision within its Postsecondary Training Procedure (80-VR-11-05) governing "[s]pecialized disability services and/or programs."

7. As the designated vocational rehabilitation agency for Ohio, OOD is charged with determining on an individual basis, together with the eligible individual, what vocational rehabilitation services would enable the individual to become competitively employed.

8. By failing to make an individualized determination of Hunter's need for the supports offered through the Kelly Autism Program, OOD's decision is in violation of the Rehabilitation Act and its implementing regulations.

9. Hunter appealed OOD's decision to deny support for the Kelly Autism Program, and pursuant to 29 U.S.C. § 722(c)(5) a Fair Hearing was held on March 18, 2019. Both OOD and Hunter simultaneously filed closing and responsive statements on March 29, 2019, and April 12, 2019, respectively. A decision was rendered on May 13, 2019, denying Hunter's appeal.

10. Hunter files this civil action for review of that decision pursuant to 29 U.S.C. § 722(c)(5)(J).

## II. JURISDICTION AND VENUE

11. This cause of action is found at 29 U.S.C. § 722(c)(5)(J), which allows for a civil action to be filed without regard to the amount in controversy.

12. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331, general federal question jurisdiction, because the Plaintiff's claim arises under a federal statute, the Rehabilitation Act of 1973.

13. Pursuant to 28 U.S.C. § 1391(b)(1) venue lies in the Southern District of Ohio, Eastern Division, because Defendants are located in this district.

## III. PARTIES

14. Plaintiff Hunter Garrett is an individual with a disability who resides in Huber Heights, Ohio. He is eligible for services from OOD.

15. Defendant OOD is headquartered in Columbus, Ohio, and is the designated state entity in Ohio that is responsible for providing vocational rehabilitation services to persons with disabilities pursuant to Title I of the Rehabilitation Act of 1973, as amended. 29 U.S.C. § 701, *et seq*.

16. OOD receives federal financial assistance for its programs and activities within the meaning of Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794(b).

17. Defendant Kevin L. Miller is the executive director of OOD and is directly responsible for ensuring that the state's vocational rehabilitation services are operated in compliance with federal law. He is sued in his official capacity.

## IV. FACTS

18. The administrative record, which Defendants must file with this Court pursuant to 29 U.S.C. § 722(c)(5)(J), is hereby incorporated by reference.

### Background

19. Hunter is a bright, nineteen-year-old young man who is diagnosed with Autism and Attention-Deficit / Hyperactivity Disorder (ADHD).

20. As a result of his disabilities, Hunter has challenges in regulating his emotions,

handling stress and unexpected situations, monitoring his sensory needs, communicating with professors and peers, and in acting impulsively.

21.     Hunter attended Wayne High School in Huber Heights, Ohio, where he was educated pursuant to an Individualized Education Program (IEP) under the Individuals with Disabilities Education Improvement Act (IDEA) to address his needs.

22.     With appropriate supports, Hunter excelled in high school, attended integrated classes, and participated in extracurricular activities with non-disabled peers.

23.     Hunter's goal following high school was to obtain competitive employment in order to support himself and live independently.

24.     Hunter was interested in pursuing a career in graphic design.  He also knew that he would need to attend college to obtain a postsecondary degree in order to achieve this goal.

25.     Hunter and his parents also agreed that in order to successfully obtain a postsecondary degree and ultimately obtain employment in graphic design, Hunter would need additional supports to address his social-emotional, communicative and executive-functioning challenges.

26.     Before graduating from high school, Hunter and his parents explored multiple postsecondary programs that provide additional supports to students with disabilities.  Hunter ultimately applied and was admitted to Western Kentucky University, as well as the University's Kelly Autism Program.

27.     Through his conversations with staff at the Kelly Autism Program, Hunter learned about services offered through state vocational rehabilitation agencies.

28.     Thereafter, in March of 2018, Hunter applied to OOD for services to help him to successfully transition from school to work, including support for the Kelly Autism Program.

## **Vocational Rehabilitation**

29.     The purpose of the Rehabilitation Act, as set forth in 29 U.S.C. § 701, *et seq*. is "to empower individuals with disabilities to maximize employment, economic self-sufficiency, independence, and inclusion and integration into society. . . ."

30.     In order to prepare individuals with disabilities for gainful employment, the Rehabilitation Act created a comprehensive program for vocational rehabilitation, providing federal funding to states to assess, plan, develop, and provide vocational rehabilitation services for individuals with disabilities, consistent with their strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice.

31.     State participation in the federal vocational rehabilitation program is voluntary, but states choosing to participate must comply with federal law and regulations under Section 720 of the Rehabilitation Act.

32.     OOD is the designated state unit in Ohio that provides vocational rehabilitation services to persons with disabilities pursuant to the Rehabilitation Act 29 U.S.C. § 701, *et seq*., and BVR is the division of OOD that provides rehabilitation services to individuals, like the Plaintiff, whose disabilities are not blindness or other visual impairment.

33.     Once an individual has been found eligible for services, OOD must conduct an assessment for determining the individual's rehabilitation needs, as appropriate, in order to determine the individual's employment outcome, and the nature and scope of vocational rehabilitation services to be included in an individualized plan for employment (IPE).  34 C.F.R. § 361.45(b)(1).

34.     Individuals must be afforded the opportunity to exercise informed choice in selecting an employment outcome, the specific vocational rehabilitation services to be provided under the IPE, the entity that will provide the services, and the methods used to procure the

services. 29 U.S.C. § 722(b)(2)(B).

35.     Federal regulations require OOD to ensure that certain vocational rehabilitation services be available to individuals, as appropriate to their vocational rehabilitation needs and consistent with their IPE, in order to assist them "in preparing for, securing, retaining, advancing in or regaining an employment outcome." 34 C.F.R. § 361.48(b). *See also* 29 U.S.C. § 723(a)(1).

36.     The services the OOD must ensure are available include, among others: (a) assessment for determining vocational rehabilitation needs; (b) vocational rehabilitation counseling and guidance, including information and support services to assist an individual in exercising informed choice; (c) vocational and other training services, including personal and vocational adjustment training, advanced training, books, tools, and other training materials; (d) job-related services, including job search and placement assistance, job retention services, follow-up services, and follow-along services; (e) transition services for students and youth with disabilities that facilitate the transition from school to postsecondary life, such as achievement of an employment outcome in competitive integrated employment, or pre-employment transition services for students; (f) other goods and services determined necessary for the individual with a disability to achieve an employment outcome. 34 C.F.R. § 361.48(b); 29 U.S.C. § 723(a). *See also* Ohio Admin. Code 3304-2-59.

37.     Transition services are defined in the federal regulations as:

> a coordinated set of activities for a student or youth with a disability—
>
> (i) Designed within an outcome-oriented process that promotes movement from school to post-school activities, including postsecondary education, vocational training, competitive integrated employment, supported employment, continuing and

adult education, adult services, independent living, or community participation;

(ii) Based upon the individual student's or youth's needs, taking into account the student's or youth's preferences and interests;

(iii) That includes instruction, community experiences, the development of employment and other post-school adult living objectives, and, if appropriate, acquisition of daily living skills and functional vocational evaluation;

(iv) That promotes or facilitates the achievement of the employment outcome identified in the student's or youth's individualized plan for employment; and

(v) That includes outreach to and engagement of the parents, or, as appropriate, the representative of such a student or youth with a disability.

34 C.F.R. § 361.5(b)(55). *See also* Ohio Admin. Code § 3304-2-59(B)(14).

38.     Currently and at the time of his application for vocational rehabilitation services, Hunter is considered a student or youth with a disability within the meaning of 34 C.F.R. § 361.5(b)(55). 34 C.F.R. § 361.5(c)(51), (58).

39.     Federal regulations require OOD to develop and maintain written policies covering the nature and scope of the services specified in 34 C.F.R. § 361.48, and the criteria under which each service is provided. The policies must ensure that the provision of services is "based on the rehabilitation needs of each individual" as identified in that individual's IPE and is "consistent with the individual's informed choice." 34 C.F.R. § 361.50(a).

40.     "The written policies may not establish any arbitrary limits on the nature and scope of vocational rehabilitation services to be provided to the individual to achieve an employment outcome." 34 C.F.R. § 361.50(a).

41.     Ohio has a regulation governing "training" services, defining it as a service that "includes, but is not limited to, vocational training, personal adjustment training, vocational adjustment training, on-the-job training, work experience, mentoring, and training services such

as books, tools, job coaching, and other training materials," and which may be provided at "universities, colleges, community/junior colleges, career technical centers, technical institutes, hospital schools of nursing, rehabilitation facilities, and other appropriate training sites or programs . . . ." Ohio Admin. Code 3304-2-58.

42.     While Ohio regulations do not provide a definition for "personal adjustment training," OOD's website provides that personal and work adjustment training includes "[a]cquiring personal habits, attitudes and skills (including social skills) needed to function effectively on the job."  OOD Website Information re:  Basic Services, available at http://ood.ohio.gov/BVR-BSVI/BVR/Basic-Services, last accessed May 22, 2019.

43.     OOD also has a "Postsecondary Training" Procedure #80-VR-11-05, upon which Defendants rely in denying Hunter's request.  The relevant section of the Procedure provides as follows:

> 3. VR Staff or VR Contractor shall determine the extent in which other postsecondary training related costs shall be included in the IPE that may be necessary due to a financial or disability related need. These may include the items listed below.
>
> a. Application fee exclusively for the least cost school.
>
> b. Specialized disability services and/or program.
>
> i. Two (2) and four (4) year accredited institutions are required to provide disability related services to individuals with a documented disability.
>
> ii. VR Staff or VR Contractor shall not authorize for disability services and/or programs without supervisory approval.  This includes programming for specialized disability populations with a separate fee associated.
>
> . . .

OOD Postsecondary Training Procedure 80-VR-11-05 at Section IV.G.3, effective December 17, 2018.[1]

## Western Kentucky University's Kelly Autism Program

44.     Now in its thirteenth year, the Kelly Autism Program provides supports to students with Autism so that they will not only graduate with a degree, but will obtain gainful employment.

45.     Autism affects the brain's early development of social and communication skills. Individuals with Autism often share common characteristics when compared to their neuro-typical developing peers, such as difficulties with social interaction, flexibility of thought, social communication and language, and sensory issues.

46.     The Kelly Autism Program provides a comprehensive array of supports that are critical to students living with Autism, who may be academically prepared but would have difficulty succeeding in college and obtaining employment without adequate supports to address their particular needs.

47.     The Kelly Autism Program is housed within Western Kentucky University's Suzanne Vitale Clinical Education Complex (CEC), which includes staff who are faculty of the University, certified speech language pathologists, a licensed mental health counselor, and program managers from a variety of backgrounds.

48.     The Kelly Autism Program offers programs for elementary, middle and high school students, as well as a program for college students called the "Circle of Support."

49.     All students within the Kelly Autism Program Circle of Support are degree seeking students at Western Kentucky University who have achieved an ACT score of at

---

[1] OOD's Postsecondary Training Procedure (80-VR-11-05) was revised in December 2018. While the relevant provision at issue was revised, there were no substantive changes as they relate here.

least 20.

50.     Every student within the Kelly Autism Program Circle of Support is assigned an advisor who meets with them at least weekly to help address concerns and challenges, such as issues with academics and professors to social or organizational concerns.

51.     Every student participates in structured "study tables," which provide on-site tutors who support the students not only with their academic curricular needs, but on executive functioning skills (organization, prioritizing work, initiation, emotional control, etc.) and, for freshman, self-monitoring skills.  The hours and staffing are consistent and structured to minimize anxiety and stress.

52.     Every student agrees to participate in Career and Professional Development over the course of their four years on campus, which includes a career assessment, analyzing career options, creating resumes, finding internships or other work experiences, completing practice interviews, begin applying for jobs, etc.

53.     Students can participate in the Career Success and Sustainability Program, which is a comprehensive pragmatic language intervention program that provides instruction in social communication skills so that students will obtain the communication skills they need to be career-ready at the time of graduation.

54.     A full-time mental health counselor offering private and group counseling is available to the students on-site at the Clinical Education Complex.

55.     Students are provided on-call support via a day phone in the event they need to reach someone immediately.

56.     Students participate in planned mentoring and social activities in order to learn and practice appropriate social communication and interaction with peers.

57.     Students may also obtain a single dorm room for the price of a shared dorm room so that they have an opportunity for independent living but also obtain the down time they need.

58.     The Kelly Autism Program Circle of Support requires a $5,000 per semester fee that is not included in the cost of tuition.

59.     The services provided through the Kelly Autism Program Circle of Support are in addition to any available accommodations provided by the university, such as extended time in a quiet environment, note takers, books on tape, readers, etc.

60.     The Kelly Autism Program is a vocational rehabilitation vendor within Kentucky.

**Hunter's Enrollment at Western Kentucky University and the Kelly Autism Program**

61.     In his first year at Western Kentucky University and the Kelly Autism Program, Hunter completed academic coursework geared to his major in visual arts and received grades of mostly As and some Bs.

62.     As a result of his disabilities, Hunter has needed and relied upon the supports offered through the Kelly Autism Program in order to be successful in his courses, and he will need continued support through the Kelly Autism Program in order to successfully complete his degree and obtain competitive employment.

63.     Hunter's advisor has been critical to his success.  Mr. Garrett has difficulty handling stress and can become easily overwhelmed.  In high school, Hunter had a "go to" person as a support through his IEP.  Now, Hunter relies heavily on his advisor, who he converses with daily.  His advisor has helped him on multiple occasions navigate interactions within the classroom environment and with professors, and coaches Hunter through problem-solving and calming strategies.

64.     For example, on one occasion, Hunter became increasingly anxious in class after receiving instructions about a new project.  He became upset and was asked to leave.  His

advisor came to meet with Hunter, helped him calm down, and negotiated with Hunter's

professors to allow him to take the rest of the day off. Hunter later talked through what

happened with the Kelly Autism Program mental health counselor. His advisor arranged a

meeting with the professor, multiple staff from the Kelly Autism Program, including himself and

Hunter, in order to come up with a strategy and plan to help Hunter be successful moving

forward.

65.     The structure of the Kelly Autism Program is also critical for Hunter. Hunter has

difficulty handling unexpected situations, or handling stress when something that was not

scheduled occurs. The Kelly Autism Program offers structured Study Tables on a set schedule

with set staffing of tutors. It offers scheduled social events with set staff so that students can

know where they will be going and with which staff and peers.

66.     Hunter, who has difficulty communicating with professors and peers, is learning

how to appropriately communicate in the workplace through his participation in the Career

Success and Sustainability Program. He also meets with the mental health counselor to help him

learn strategies and communication skills.

67.     The supports provided by the Kelly Autism Program assist Hunter in completing

his coursework and developing the skills necessary to obtain and keep competitive employment

after graduation.

68.     Hunter's parents and advisor believe that if Hunter did not have the Kelly Autism

Program supports, he would be overwhelmed by stress and unable to complete his coursework.

69.     Hunter uses his father's GI Bill to pay for the cost of tuition at Western Kentucky

University, and his income is limited to any support that his parents can provide to him.

70.     Without support from the vocational rehabilitation agency, Hunter has been

forced to rely on financial contributions from his parents to attend the Kelly Autism Program for two semesters.

## Application for Vocational Rehabilitation Services

71.    In his final semester of high school, Hunter applied for vocational rehabilitation services on March 23, 2018, and was found eligible for services on March 30, 2018.

72.    After Hunter was found eligible for services, OOD assigned him to a vocational rehabilitation counselor (VR counselor).

73.    During initial conversations with his VR counselor, Hunter and his parents informed the VR counselor about Hunter's job goal and requested that OOD support Hunter in attending Western Kentucky University and the Kelly Autism Program.

74.    The VR counselor agreed to support Hunter's job goal, and agreed with Hunter's enrollment at Western Kentucky University in pursuit of that goal.

75.    However, the VR counselor denied Hunter's request that OOD support the Kelly Autism Program.  The justification provided by the VR counselor was that "the agency does not support such programs as the Kelly program."

76.    When asked to provide a reason, the VR counselor explained as follows:  "It is written in policy that the agency does not support such programs.  You are able to look up the policies on line I believe but it states:  VR staff shall not authorize for disability services or programs that are not required for an educational school or institution to provide without supervisor approval.  This includes programming for specialized disability populations with a separate fee associated."

77.    In December 2018, Hunter and his parents requested that OOD support the Kelly Autism Program for Hunter's Spring Semester, and provided additional information to the VR counselor about the program.

78.    On January 8, 2019, OOD denied Hunter's request.  The VR counselor recognized that "the program sounds like it is beneficial to Hunter however the answer would still be a no from the agency on supporting the funding of the program."

79.    When asked again for the reason for the denial, the VR counselor stated, "The reason we are unable to support the Kelly Autism Program is that the agency's postsecondary policy states that a counselor will not authorize for specialized disability populations with a separate fee associated," based on "3.b.11:  VR staff or contractor shall not authorize for disability services and/or programs that are required for an educational school or institution to provide without supervisor approval.  This includes programming for specialized disability populations with a separate fee associated."

80.    The VR counselor provided no other explanation or justification for the denial. The VR counselor did not provide any further counseling or guidance to Hunter to enable him to exercise informed choice in obtaining the services he needed.

81.    Hunter's case file with OOD contained no documentation of any conversations or emails between the VR counselor and his supervisor regarding the Kelly Autism Program.

82.    Hunter's case file with OOD contained no documentation of any other explanation or justification for the denial, or any individualized determination by an OOD counselor or supervisor that the Kelly Autism Program was not a necessary vocational rehabilitation service for Hunter.

**Appeal**

83.    On January 12, 2019, Hunter filed an appeal regarding OOD's decision to deny support for the Kelly Autism Program.

84.    A meeting was held on February 7, 2019, to attempt to resolve the appeal informally.

85.     During the informal meeting, the VR counselor stated that OOD's decision not to fund the Kelly Autism Program was above his head.  He said he spoke about it with his supervisor.

86.     The VR supervisor stated that OOD does not support these types of programs, and he did not see anything that would warrant an exception.  When asked what would warrant an exception, he stated that he could not provide any criteria for what justifies an exception, but stated that the agency has taken a stand that they will not pay for the types of services that the school should be providing.

87.     Prior to this meeting, no one from OOD had stated that a reason for the denial was that they thought the university should be providing the services to Hunter for free.

88.     Indeed, Western Kentucky University charges an additional fee for students to obtain the supports offered by the Kelly Autism Program:  $5,000 per semester.  But even if the university were required to provide the supports offered by the Kelly Autism Program for free and was failing to do so, OOD would still be required to provide or pay for the program in these circumstances.  *See* 34 C.F.R. § 361.53(c)(2), 34 C.F.R. § 361.53(e)(2).

89.     Crystal Hoffman, the OOD Supervisor who conducted the meeting, issued a letter dated February 14, 2019, upholding OOD's decision to deny support for the Kelly Autism Program.  Her determination to uphold the decision appeared to be based on an alleged lack of data about other Kelly Autism Program participants' employment outcomes, and an alleged lack of a phase out plan for supports.

90.     Prior to this meeting, no one from OOD had raised any issues with data or phase out plans, nor did Ms. Hoffman's decision rely on any statute, regulation, policy or procedure that required either as a requisite for support.

**Formal Hearing**

91.     On March 18, 2019, a Fair Hearing was held before Hearing Examiner John A. Izzo, with closing statements and responses simultaneously filed on March 29, 2019, and April 12, 2019, respectively.

92.     Prior to a formal hearing being held, Hunter filed a motion to permit two witnesses from the Kelly Autism Program to participate in the fair hearing via teleconference or videoconference – the Director of the Kelly Autism Program and the Assistant Program Manager of the Kelly Autism Program who was assigned as Hunter's advisor – in order to provide critical testimony to an understanding of the structure of the Program, the services it provides, and Hunter's relationship with the Program.

93.     The hearing examiner issued a decision on March 12, 2019, only permitting one witness to testify via teleconference.  The Assistant Program Manager with the Kelly Autism Program (Hunter's advisor) participated in the hearing by teleconference.  Hunter was permitted to testify via teleconference without objection.  The testimony of the Director of the Kelly Autism Program was therefore excluded.

94.     Hunter and his advisor provided testimony about the supports provided by the Kelly Autism Program.  Hunter, his parents and advisor also provided ample testimony about how such supports were necessary for Hunter in order to complete his degree and prepare for and obtain competitive employment.

95.     OOD argued that Hunter's request for support for the Kelly Autism Program was denied on the basis that the VR counselor and supervisor believed that OOD's postsecondary training policy prohibited payment for such a program, unless the supervisor granted an exception in his discretion.

96.     The supervisor did not provide any criteria to consider in order to grant an

exception under such a policy.

97.     During the hearing and in closing briefs, OOD advanced a number of new arguments to justify its decision not to support Hunter's participation in the Kelly Autism Program.

98.     For example, the VR counselor and supervisor testified that the vocational necessity of the program was not apparent, and that they believed it was comprised of a substantial socialization component.

99.     Prior to their testimony at the hearing, neither the VR counselor nor supervisor made a written record documenting their determination that the Kelly Autism Program would not benefit Hunter, or their belief that it was not vocationally necessary or was comprised of a substantial socialization component.  Neither did they provide such information to Hunter.  On the contrary, the VR counselor documented that he believed the program would benefit Hunter but that OOD would still deny his request.

100.     The VR counselor testified that he spoke with the supervisor about Hunter's request for support for the Kelly Autism Program based on the information he had at the time about the program, even though Hunter's case file with the agency contained no documentation of any conversations or emails between the VR counselor and his supervisor regarding the Kelly Autism Program.

101.     Evidence presented at the hearing also showed that neither the VR counselor nor supervisor contacted the Kelly Autism Program in order to establish what supports were offered to participants and whether Hunter had a need for such supports.

102.     The VR counselor testified that when Hunter had requested support for the Kelly Autism Program, he reviewed some information on the website and called the Kelly Autism

Program solely to ask if Hunter could open a vocational rehabilitation case in Kentucky so that Kentucky's vocational rehabilitation agency could pay for the program instead.

103.    Hunter's case file with the agency contained no documentation of any conversations or emails between the VR counselor and his supervisor with staff of the Kelly Autism Program.

104.    The VR counselor also testified that he received and reviewed Hunter's Individualized Education Program (IEP), Evaluation Team Report (ETR), and health assessment questionnaire, but did not consider whether Hunter would need supports to address the challenges outlined in those documents in order to be successful in college and obtain competitive employment.

105.    The VR supervisor testified that any decision he made was based solely on information provided to him by the VR counselor.

106.    The testimony established that neither the VR counselor nor supervisor were aware of all of the supports offered by the Kelly Autism Program, and that their discussions were about how there were no known exceptions to allow OOD to pay for the Kelly Autism Program.

107.    OOD also argued that the reason for the denial was because other "community resources" were available that "provide some of the same services as the [Kelly Autism Program] (i.e. Best Buddies Program)."

108.    Neither the VR counselor nor supervisor testified that the availability of other "community resources" was the reason for denying Hunter's request, and OOD did not advance credible evidence showing what supports "Best Buddies" provides, and how it would allegedly

meet Hunter's needs.[2]

109.    On May 13, 2019, the Hearing Examiner issued a decision upholding OOD's decision not to support the Kelly Autism Program, finding that OOD proved it is more likely than not that the Kelly Autism Program is not vocationally necessary.

## V.    DEFENDANTS' VIOLATIONS OF THE REHABILITATION ACT AND ITS IMPLEMENTING REGULATIONS

110.    OOD's determination not to support Hunter's participation in the Kelly Autism Program, and the hearing officer's decision upholding that determination were contrary to the requirements of the Rehabilitation Act and its implementing regulations, and must be overturned.

111.    Federal law requires that the hearing officer issue a decision based on the provisions of the approved State plan, the Rehabilitation Act, 29 U.S.C. § 701, *et seq*. and its implementing regulations, and State regulations and policies that are consistent with the federal requirements specified in the title. 29 U.S.C. § 722(c)(5)(A); 34 C.F.R. § 361.57(e)(3).

112.    OOD's decision to deny support for Hunter's participation in the Kelly Autism Program violated the Rehabilitation Act and its implementing regulations:

a)    OOD failed to make available to Hunter vocational rehabilitation services to assist him in preparing for, securing, retaining, or regaining an employment outcome consistent with his strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice, specifically:  vocational rehabilitation counseling and guidance, vocational and other training services, transition services, and other goods and services, as required by 29 U.S.C. § 723, 34 C.F.R. § 361.48(b).

---

[2]  Best Buddies Kentucky does not offer the breadth of services provided through the Kelly Autism Program. *See* https://www.bestbuddies.org/kentucky/.

b)      OOD failed to afford Hunter the opportunity to exercise informed choice in selecting the specific vocational rehabilitation services to be provided under the plan, the entity that will provide the vocational rehabilitation services, and the methods used to procure the services, as required by 29 U.S.C. § 722(b)(2)(B).

c)      OOD supervisory staff rejected the conclusions of Hunter, his parents, and staff of Western Kentucky University that the services provided by the Kelly Autism Program were vocational rehabilitation services necessary for Hunter to obtain competitive employment, without reliable, probative, or substantial evidence to support their determination, in violation of 34 C.F.R. § 361.48.

d)      OOD denied Hunter necessary vocational rehabilitation services pursuant to a Postsecondary Training Procedure that effectively prohibits payment for "specialized disability services and/or programs," which therefore sets an arbitrary limit on the nature and scope of vocational rehabilitation services, in violation of 34 C.F.R. § 361.50(a).

e)      OOD denied Hunter necessary vocational rehabilitation services pursuant to a policy which failed to ensure that the provision of services was based on the rehabilitation needs of each individual consistent with informed choice, as required by 34 C.F.R. § 361.50(a), 34 C.F.R. § 361.48(b) and 29 U.S.C. § 723(a)(1).

113.    The decision of the hearing officer upholding OOD's determination did not follow the Rehabilitation Act and its implementing regulations:

a)      In reaching his decision, the hearing examiner ignored evidence and arguments presented at the hearing demonstrating both procedural and substantive

20

violations of the Rehabilitation Act by OOD, as detailed in the preceding paragraph.

b)      The hearing examiner erred in refusing to permit one of Hunter's witnesses to participate in the fair hearing via teleconference or videoconference. Such error was prejudicial to Hunter, as testimony from the director of the Kelly Autism Program could have provided important information regarding the development of the Kelly Autism Program, the supports offered as related to the needs of students with Autism, the qualifications and training of Kelly Autism Program staff, the relationship of the Kelly Autism Program with vocational rehabilitation agencies, etc.  The hearing examiner should have permitted Hunter to present the witness' testimony, after which the hearing examiner could have sustained any objections and/or rule on its admissibility and the witness' credibility.

c)      The hearing examiner erred in concluding that, "The testimony of others Mr. Garrett wished to have testify remotely could be proffered at the hearing.  No such testimony was proffered."  Hunter's motion to allow remote testimony of others was denied before the fair hearing, with the hearing examiner stating he would only "allow Mr. Garrett to present one witness' testimony via teleconference."  The hearing officer then inappropriately relied on the lack of a proffer of evidence after refusing to allow the testimony in the first place.

d)      The hearing examiner erred in failing to review and base his decision from the transcript of testimony, which, according to the court reporting agency, had not been ordered.

e)  The hearing examiner erred in finding that OOD was permitted to provide new reasons for the denial at the hearing, in violation of 34 C.F.R. § 361.52.

f)  The hearing examiner's finding that OOD met its burden and was justified in refusing to support Hunter's participation in the Kelly Autism Program on the basis that there was a lack of evidence about vocational services provided by the Kelly Autism Program and that it was not vocationally necessary was not supported by the evidence.  Rather, the evidence showed that OOD failed to determine at all what supports were offered by the Kelly Autism Program prior to denying Hunter's request and that OOD failed to assess Hunter's need for such services.  And, the evidence showed that the Kelly Autism Program provided vocational rehabilitation services (vocational and other training services, transition services, and/or other goods and services) that were necessary for Hunter, due to his disability, to obtain his employment outcome.

g)  The hearing examiner erred in finding that, "Because OOD pays for services, not programs, and the [Kelly Autism Program] would not parse out necessary services nor have a la carte pricing, the program could not be paid for. [Kelly Autism Program] requires the whole $5,000.00 fee must be paid, regardless of which resources were used by those in the program."

h)  The hearing examiner erred in finding a lack of vocational necessity based on a lack of data presented at the hearing regarding the success rate of other students, and a speculation that other students with autism do not need the Kelly Autism Program, as federal law requires an individualized determination of Hunter's needs under 34 C.F.R. § 361.50(a).

114.    Accordingly, Defendants did not follow the procedures of the Rehabilitation Act, 29 U.S.C. § 701, *et seq*. or its implementing regulations, in providing vocational rehabilitation services to Hunter and this has caused Hunter harm because he will not receive support for necessary vocational rehabilitation services as a result.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to:

A.    Order a briefing schedule to allow the parties to present arguments on the issues raised;

B.    Receive the record of the administrative proceedings;

C.    Hear additional evidence at the request of Plaintiff;

D.    Declare that OOD's determination to deny support for Hunter's participation in the Kelly Autism Program violates the Rehabilitation Act of 1973 as amended, and its implementing regulations;

E.    Declare that the decision of the hearing officer is in violation of the Rehabilitation Act of 1973 as amended, and its implementing regulations;

F.    Declare that OOD's policy and practice of refusing to support eligible students to participate in programs like the Kelly Autism Program violates the Rehabilitation Act of 1973 as amended, and its implementing regulations;

G.    Reverse the hearing examiner's decision upholding OOD's determination to deny support for Hunter's participation in the Kelly Autism Program;

H.    Order OOD to prepare an IPE for Hunter which includes payment by OOD for vocational rehabilitation services offered through the Kelly Autism Program;

I.    Order OOD to reimburse Hunter for the payments he made for the Kelly Autism Program;

J.    Order of costs; and

K.    Grant such further relief as this Court deems just and proper.

Respectfully Submitted,

s/Alison McKay
Alison McKay (0088153)
amckay@disabilityrightsohio.org
Trial Attorney
Kristin Hildebrant (0042086)
khildebrant@disabilityrightsohio.org
Disability Rights Ohio
200 Civic Center Drive, Suite 300
Columbus, Ohio  43215
Telephone:  614-466-7264
Facsimile:   614-644-1888

Counsel for Plaintiff