**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**HUNTER J. GARRETT,**

      **Plaintiff,**

                                **Case No. 2:19-cv-2227**

      **vs.**                          **Magistrate Judge Elizabeth P. Deavers**

**OPPORTUNITIES FOR OHIOIANS
WITH DISABILITIES,** *et al.*,

      **Defendants.**

## <u>OPINION AND ORDER</u>

      This case is an appeal from an administrative decision by Defendant Opportunities for Ohioans with Disabilities ("OOD") denying Plaintiff Hunter Garrett's request for OOD to support his participation in an autism program at a university.  With the consent of the parties, ECF No. 12, 28 U.S.C. § 636(c), this matter is before the Court for consideration of Plaintiff Hunter J. Garrett's Initial Merit Brief on Hearing Officer's Report and Recommendation.  (ECF No 63.)  On December 13, 2021, Defendant OOD filed Defendant Opportunities for Ohioans with Disabilities' Answering Brief.  (ECF No. 64.)  On December 22, 2021, Plaintiff filed Plaintiff Hunter J. Garrett's Reply in Support of His Initial Merit Brief.  (ECF No. 65.)  Accordingly, the matter is ripe for judicial review.  For the reasons the follow, the Hearing Officer's Report and Recommendation is **REVERSED**.

## I.  LEGAL BACKGROUND

      This case arises under Title I of the Rehabilitation Act of 1973, as amended by Title IV of the Workforce Innovation and Opportunity Act, 29 U.S.C. § 701, *et seq*.  (the "Rehabilitation Act"), which grants states federal funding to provide individuals with disabilities with vocational

rehabilitation ("VR") services[1] with the goal of preparing those individuals for gainful

employment.  Defendant OOD is the designated state entity in Ohio that is responsible for

providing VR services to persons with disabilities pursuant to the Rehabilitation Act, which

includes making decisions affecting eligibility for VR services, the nature and scope of available

services, the provision of services, and the allocation and expenditure of funds.  (ECF No. 1 at

PAGEID # 15; ECF No. 64 at PAGEID # 1322.)  Defendant OOD receives 78.7% of its funding

for VR services through federal grants.  34 C.F.R. § 361.60(a)(1).

One of the thirty-six explicit requirements for state plans under the Rehabilitation Act is

an individualized plan of employment ("IPE").  29 U.S.C. § 721(a)(9).  An IPE contains specific

terms and conditions "descri[bing] the specific [VR] services that are needed to achieve the

employment outcome."  29 U.S.C. § 722(b)(4)(B)(i)(I).  It is signed by both the client and a state

rehabilitation counselor and must be reviewed annually.  29 U.S.C. § 722(b)(2)(A),(C), (E)(i).

Each IPE must be developed and implemented in a manner that affords the eligible individual the

opportunity "to exercise informed choice in selecting an employment outcome, the specific [VR]

services to be provided under the plan, the entity that will provide the [VR] services, and the

methods used to procure the services."  29 U.S.C. § 722(b)(2)(B).

In the event of a dispute regarding "determinations made by personnel of [the OOD] that

affect the provision of [VR] services to applicants or eligible individuals," eligible individuals

can request an impartial due process hearing.  29 U.S.C. § 722(c)(1).  In such instances, the due

process hearing must be conducted by an impartial hearing officer who shall then issue a written

---

[1] The Rehabilitation Act defines vocational rehabilitation services as "any services
described in an individualized plan for employment necessary to assist an individual with a
disability in preparing for, securing, retaining, or regaining an employment outcome that is
consistent with the strengths, resources, priorities, concerns, abilities, capabilities, interests, and
informed choice of the individual."  29 U.S.C. § 723(a).

decision.  29 U.S.C. § 722(c)(5)(A).  Under the Rehabilitation Act, that decision shall be final,

except that "[a]ny party aggrieved by a final decision" following a hearing may bring suit in any

state court or in a federal district court.  29 U.S.C. §§ 722(c)(5)(G), (J).  In any action brought in

a federal district court, "the court . . . basing the decision of the court on the preponderance of the

evidence, shall grant such relief as the court determines to be appropriate."  29 U.S.C. §

722(c)(5)(J)(ii)(III).

## II.  FACTUAL BACKGROUND

### A.    Plaintiff

Plaintiff is a twenty-two (22) year old who has been a student at Western Kentucky

University ("WKU") for the past four years.  Plaintiff has Autism Spectrum Disorder ("ASD")

and Attention-Deficit/Hyperactivity Disorder ("ADHD").  (ECF No. 63 at PAGEID # 1112.)

As a result of his disabilities, Plaintiff has difficulty communicating with professors and peers,

handling stress, adapting to change, handling unexpected situations, regulating and controlling

emotions like frustration and anger, and monitoring his sensory needs (including sensitivity to

noise).  (Admin. Rec., ECF No. 11 at PAGEID ## 260, 263-264, 277-278.)

In 2018, Plaintiff graduated from Wayne High School in Huber Heights, Ohio.  In high

school, Plaintiff received school-based Occupational Therapy services as part of an

Individualized Education Program ("IEP"), which helped support Plaintiff's sensory, behavioral,

and classroom needs.  (*Id.* at PAGEID ## 262-275.)  One of his high school teachers noted that

"[s]ome of his weaknesses are in social and emotional behavior."  (*Id.* at PAGEID # 263.)  To

this end, it was noted that Plaintiff "needs to recognize his communication differences and

engage in activities/discussions regarding how such differences may be perceived by others as

well as changes he can make to reduce these differences including advocating for his need to use

his calming strategies." (*Id.* at PAGEID ## 264, 269.) With the support of school district officials as set forth in his IEP, Plaintiff performed very well academically and he was active in extracurricular activities such as the marching band and a Digital Desktop Publishing Competition (at which he successfully reached the state level of the competition). (*Id.* at PAGEID ## 262-275.)

In January 2018, before his last semester of high school, Plaintiff's IEP indicated that he wanted to "attend an associate program in the arts" after graduation, that he "[Plaintiff] and his parents want him to attend a college with support to make sure he is successful." (*Id.* at PAGEID # 263.) On March 23, 2018, during his last semester of high school, Plaintiff applied for VR services from OOD. (*Id.* at PAGEID ## 256-257.) On March 30, 2018, William Trevino, a VR counselor for OOD, wrote Plaintiff to notify him that OOD determined that he was eligible for VR services, noting that he was "Significantly Disabled" and was "seriously limit[ed]" in the areas of "Self-Direction" and "Work Skills." (*Id.* at PAGEID # 261.)

## B.    Kelly Autism Program

The Kelly Autism Program ("KAP") at WKU offers a wide array of educational, employment, and life skills programs for students of all ages[2] who those diagnosed with ASD or other developmental or social language delays. (*See id.* at PAGEID # 323.) For students who attend WKU, the purpose of the KAP is to "help address the challenges faced by postsecondary students with ASD so they can meet their educational and vocational goals." (ECF No. 63-5 at PAGEID # 1277.) Before the KAP was developed at WKU, the retention rate for students with ASD was less than 25%. (*Id.* at PAGEID # 1278.) In the past five years, however, WKU has

---

[2] The program for postsecondary students is the KAP Circle of Support program. (*Id.*) For ease of reference, the Court will refer to the KAP Circle of Support program as "KAP."

retained and graduated over 80% of KAP participants. (*Id.*) For perspective, this figure is higher than WKU's overall retention and graduation rates from the 2019-2020 academic year. (*Id.*)

All college students within the KAP are degree-seeking students at WKU who have achieved an ACT score of at least 20. (ECF No. 11 at PAGEID ## 325-326.) Not all students who apply for the KAP are placed in the program, as support is limited and not all applicants are determined to need the program to succeed. (ECF No. 63-4 at PAGEID # 1229.) Participating in the KAP requires a $5,000 per semester fee that is not included in the cost of WKU's tuition. (ECF No. 63-5 at PAGEID # 1277.) The actual cost of each participant's individualized support exceeds this amount, and WKU provides the additional costs. (*Id.*)

The KAP includes students from fourteen states, seven of which provide VR funding (in part or in full) for the program. (ECF No. 63-4 at PAGEID ## 1272-1273.) That said, if students attempt to obtain VR funding for the program, "they almost always get funding." (ECF No. 11 at PAGEID # 475.)

**C.      Plaintiff's Requests for OOD Support for the Kelly Autism Program**

In June 2018, Plaintiff met with Mr. Trevino to discuss what VR services OOD would support for Plaintiff in college. (*Id.* at PAGEID # 195.) Plaintiff and his mother advised Mr. Trevino that Plaintiff was enrolling at the KAP at WKU, and Mr. Trevino "told the pair the policy that [OOD] does not support such programs." (*Id.*) According to Mr. Trevino's notes from that meeting, "[Plaintiff] and his mother then asked if there was anyone else that they would be able to talk to about getting support for the [KAP]," and Mr. Trevino explained that there was an appeal process they could initiate. (*Id.*) On July 5, 2018, Plaintiff's father emailed Mr. Trevino and asked for the "reason why the request for the Kelly Autism Program was denied." (*Id.* at PAGEID # 186.) Mr. Trevino replied in relevant part as follows:

5

It is written in policy that the agency does not support such programs. You are able to look up the policies online I believe but it states: VR staff shall not authorize for disability services or programs that are not required for an educational school or institution to provide without supervisor approval. This includes programming for specialized disability populations with a separate fee associated.

(*Id.*)

In late July 2018, Mr. Trevino and Plaintiff created the IPE for Plaintiff's freshman year of college.  (*Id.* at PAGEID ## 297-301.)  Plaintiff's IPE indicated that his "employment outcome" was to become a "Graphic Designer," and listed a number of steps which were "needed to reach [Plaintiff's] employment goal, including "Job interviewing skills."  (*Id.* at PAGEID # 297.)  The IPE also indicated that OOD would provide "Job Placement Assistance," school books, travel benefits, interview and work attire, and a laptop.  (*Id.* at PAGEID # 298.)

On January 9, 2019, after Plaintiff's first semester at WKU, Mr. Trevino met with Plaintiff and his father to discuss OOD support for the upcoming winter semester.  (*Id.* at PAGEID # 168-169.)  Before the meeting, Plaintiff's father wrote Mr. Trevino an email that stated that "OOD can and should pay for the [KAP] as Kentucky VR does."  (*Id.* at PAGEID # 168.)  During the meeting, Plaintiff reported that his first semester went well "all things considered," and Plaintiff's father requested that OOD pay for the KAP for the upcoming semester.  (*Id.*)  Plaintiff explained to Mr. Trevino how the KAP had helped him, and how Plaintiff's KAP counselor "has mentioned to [Plaintiff's] parents that [Plaintiff] would benefit from socializing more."  (*Id.*)  Mr. Trevino agreed with Plaintiff and Plaintiff's father that the KAP "sounds like it is beneficial to [Plaintiff]," but advised them that "the answer would still be a no from [OOD] on supporting the funding of the program."  (*Id.* at PAGEID ## 168-169.)

Later that day, Plaintiff's father emailed Mr. Trevino and asked for "the reason for denial of KAP funding."  (*Id.* at PAGEID # 167.)  Mr. Trevino replied that "[t]he reason we are unable to support the Kelly Autism Program is that the agency's post-secondary policy states that a

§counselor will not authorize for specialized disability populations with a separate fee associated." (*Id.* at PAGEID # 166.)  Plaintiff's father asked for the specific regulation to which Mr. Trevino was referring, and Mr. Trevino responded as follows:

> 3.b.II: VR staff or contractor shall not authorize for disability services and/or programs that are required for an educational school or institution to provide without supervisor approval. This includes programming for specialized disability populations with a separate fee associated.

(*Id.*)

**E.    Plaintiff's Appeal**

On January 14, 2019, Plaintiff appealed the denial of OOD support for the KAP and requested a Fair Hearing pursuant to Ohio Administrative Code § 3304-2-62 and 34 C.F.R. § 361.57.  (*Id.* at PAGEID ## 157-161.)  On February 7, 2019, an informal administrative review meeting was held "to review the reasons for [Plaintiff's] appeal and discuss the possibility of an informal resolution."  (*Id.* at PAGEID # 162.)  Attending the February 7, 2019 meeting were Plaintiff; Plaintiff's parents; Plaintiff's counsel; Mr. Trevino; two representatives from the KAP, Ryan McKenna and Michelle Elkins; and Crystal Hoffman, a Vocational Rehabilitation Training Supervisor for OOD who handled the informal administrative review.  (*Id.*)

On February 14, 2019, Ms. Hoffman notified Plaintiff that she supported the decision by Mr. Trevino and his supervisor for OOD to not support the funding of the KAP.  (*Id.* at PAGEID ## 162-165.)  She found that Mr. Trevino consulted with his supervisor about the issue, and that "[t]here was consideration of your unique support needs, as well as OOD policy and procedure."  (*Id.* at PAGEID # 164.)  Ms. Hoffman concluded, however, that there was insufficient information about the KAP:

> Although the KAP may be financially supported by other state's VR programs, **there is not data to support the employment outcomes of participants in the program having increased success compared to other VR participants with similar support needs**. The program provides a significant amount of support to

> students based on their individualized needs, yet there is not a phase out plan for supports promoting increased independence in preparation for employment in a community integrated setting.

(*Id.* (emphasis added).)  Ms. Hoffman advised Plaintiff that he could withdraw his appeal, but that if he wanted to continue then OOD would move forward with a hearing.  (*Id.*)

Plaintiff did not withdraw his appeal, so OOD held a Fair Hearing on March 18, 2019, before Hearing Officer John Izzo.  (*Id.* at PAGEID # 380-643.)  During the hearing, Plaintiff called five witnesses to testify on his behalf and OOD called three witnesses to testify on its behalf.  (*Id.*)[3]  After the hearing, Plaintiff and OOD each submitted closing arguments and responses in writing.  (*Id.* at PAGEID ## 90-134.)  On May 13, 2019, Mr. Izzo issued a Report and Recommendation and recommended "that the decision to deny [Plaintiff] funding for the Kelly Autism Program be AFFIRMED, as the evidence presented at the hearing did not indicate the KAP provided vocationally services [sic]."  (*Id.* at PAGEID ## 51-89.)  Mr. Izzo found in relevant part as follows:

> Although the Case Notes did not document the reason why the funding for the KAP was denied, OOD adequately explained the reasons for denial during the presentation of its case. Primarily, OOD determined all of the services provided by KAP were not vocationally necessary. In addition, because OOD pays for services, not programs, and the KAP would not parse out necessary services nor have a la carte pricing, the program could not be paid for. KAP requires the whole $5,000.00 fee must be paid, regardless of which resources were used by those in the program.
>
> In addition, there was no data to show the success rate of the career development program. If the program is not successful, it is clearly not necessary. Without any

---

[3] Prior to the hearing, Plaintiff filed a motion to permit other witnesses to testify via teleconference or videoconference.  (ECF No. 11 at PAGEID ## 137-144.)  Specifically, Plaintiff submitted his intention to call two witnesses from the KAP – the Director and an Assistant Program Manager of the KAP – to provide information about the KAP and its relevance to Plaintiff.  (*Id.*)  OOD objected to Plaintiff's request.  (*Id.* at PAGEID ## 145-150.)  On March 12, 2019, Mr. Izzo denied Plaintiff's motion in part and held that he would only allow Plaintiff to call one witness to testify by phone.  (*Id.* at PAGEID ## 151-155.)  Accordingly, the Assistant Program Manager of the KAP testified during the Fair Hearing, but the Director of the KAP did not.  (*Id.* at PAGEID ## 380-643.)

data presented, there is no evidence of success or necessity. With other autistic students attending [WKU] but not in the KAP, it raises a question as to whether participation is a necessity.

***

OOD proved it is more likely than not that the KAP program is not vocationally necessary. [Plaintiff] presented testimony indicating the benefits he received by participating in the program. However, the evidence presented by [Plaintiff] does not support a determination that participation in the program is vocationally necessary.

(*Id.* at PAGEID ## 85-86.)

## F.    Procedural History

Plaintiff initiated this lawsuit on May 28, 2019, pursuant to 29 U.S.C. § 722(c)(5)(j).

(ECF No. 1.)  On March 31, 2020, the Court denied Defendants' motion to dismiss Defendant

Miller from the action, and granted Plaintiff's motion to submit additional evidence.  (ECF Nos.

24, 25.)  Specifically, the Court granted Plaintiff leave to submit the testimony of the Director of

the KAP, who Plaintiff attempted to have testify remotely at the Fair Hearing.  (ECF No. 25.)

On August 20, 2020, the Court granted Defendants' motion to submit additional evidence.  (ECF

No. 32.)

On November 22, 2021, Plaintiff filed Plaintiff Hunter J. Garrett's Initial Merit Brief on

Hearing Officer's Report and Recommendation, requesting that the Court do the following:

(1) Reverse the Hearing Decision; (2) Declare that Defendants' decision to deny support for Hunter's participation in the Kelly Autism Program, and the Hearing Decision affirming the same, violates the Rehabilitation Act and its implementing regulations; (3) Declare that Defendants' policy or practice of refusing to support eligible students to participate in programs like the Kelly Autism Program violates the Rehabilitation Act and its implementing regulations; (4) Order Defendants to reimburse Hunter for payments made for the Kelly Autism Program at $5,000 per semester; (5) Order Defendants to amend Hunter's IPE to include the Kelly Autism Program as a vocationally necessary service for Hunter; (6) Order Defendants to pay for costs; and (7) Grant such further relief as this Court deems just and proper.

(ECF No. 63 (the "Merit Brief") at PAGEID # 1126 (internal footnote omitted).)  On December 13, 2021, OOD filed Defendant Opportunities for Ohioans with Disabilities' Answering Brief. (ECF No. 64 (the "Opposition").)  On December 22, 2021, Plaintiff filed his Reply in Support of His Initial Merit Brief.  (ECF No. 65 (the "Reply").)  The merit briefing is thus ripe for judicial review.

### III.  STANDARD OF REVIEW

As discussed above, the Rehabilitation Act grants this Court with the authority to "grant such relief as the court determines to be appropriate."  29 U.S.C. § 722(c)(5)(J)(ii)(III).  This language is virtually identical to that within the Individuals with Disabilities Education Act ("IDEA").  *Compare id. with* 20 U.S.C. § 1415(i)(2)(C) ("In any action brought under this paragraph, the court . . . basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.").  Given this substantial overlap, Courts have looked to case law interpreting IDEA's grant of authority when evaluating Rehabilitation Act cases.  *See Diamond v. Michigan*, 431 F.3d 262, 265 (6th Cir. 2005) ("To determine the standard of review under the [Rehabilitation] Act, the district court looked to case law interpreting an identical judicial review provision in the Individuals with Disabilities Education Act ("IDEA") for guidance.") (citing *Kings Local Sch. Dist., Bd. of Educ. v. Zelazny,* 325 F.3d 724, 728 (6th Cir. 2003) (interpreting 20 U.S.C. § 1415(i)(2))).  Accordingly, the Court will do so again here.

Under the IDEA, a district court must give "modified de novo review" to the administrative officer's finding of facts.  *Adam Wayne D. ex rel. David D. v. Beechwood Indep. Sch. Dist.*, 482 F. App'x 52, 56 (6th Cir. 2012) (citing *N.L. v. Knox County Sch.,* 315 F.3d 688, 692 (6th Cir.2003).  Under this standard of review, "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving

some deference to the fact findings of the administrative proceedings." *Knable ex rel. Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 764 (6th Cir. 2001).[4] This means that a Court may set aside administrative findings "only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 312–13 (6th Cir. 2007) (internal quotation marks and citations omitted). When educational expertise is relevant to an ALJ's finding, the reviewing court affords the finding more weight. *Somberg*, 908 F.3d at 172 (citing *McLaughlin v. Holt Pub. Schs. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003)). But when educational expertise is not relevant to the

---

[4] In its Opposition, OOD argues that the Hearing Officer's Report and Recommendation "is entitled to substantial deference," rather than just "some" deference. (ECF No. 64 at PAGEID # 1314 (internal quotation marks and citation omitted).) In support, OOD relies on a (miscited) case from the Southern District of Indiana, notwithstanding OOD's position that "another Court in this District" has so held. (*Id.*) The Court is not persuaded by this nonbinding holding, however, and will apply the law as it has been consistently interpreted by courts throughout the Sixth Circuit. *See Somberg on behalf of Somberg v. Utica Cmty. Sch.*, 908 F.3d 162, 172 (6th Cir. 2018) ("In reviewing an ALJ's decision in an IDEA case, district courts apply a 'modified de novo' standard that requires the court 'to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving *some deference* to the fact findings of the administrative proceedings.'") (emphasis added) (quoting *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 849–50 (6th Cir. 2004); *C.M. v. Rutherford Cty. Sch.*, No. 3:20-CV-1088, 2022 WL 964206, at *2 (M.D. Tenn. Mar. 30, 2022) (same); *Maple Heights City Sch. Bd. of Educ. v. A.C. Individually & on behalf of A.W.*, No. 1:14CV1033, 2016 WL 3475020, at *4 (N.D. Ohio June 27, 2016) ("The Sixth Circuit has explained that 'a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving *some deference* to the fact findings of the administrative proceedings.'") (emphasis added) (quoting *Knable*); *Shafer v. Whitehall Dist. Sch.*, No. 1:10-CV-1170, 2013 WL 1304920, at *7 (W.D. Mich. Mar. 28, 2013) ("'Under a modified de novo standard of review, a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving *some deference* to the fact findings of the administrative proceedings, particularly when educational expertise is essential to the findings.") (emphasis added) (citing *Knox Cty. Schs.*, 315 F.3d at 692); *T.J. v. Winton Woods City Sch. Dist.*, No. 1:10-CV-847, 2013 WL 1090465, at *8 (S.D. Ohio Mar. 15, 2013) ("The Sixth Circuit has explained that "a district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving *some deference* to the fact findings of the administrative proceedings.'") (emphasis added) (quoting *Knable*).

finding, the reviewing court affords the finding less weight because the court is as well suited to evaluate the issue as the ALJ.  *Id.*  This standard of review of administrative findings "afford[s] less deference than that given to agencies under the substantial evidence test."  *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 567 (6th Cir. 2000).

## IV.  ANALYSIS

By far more than a preponderance of the evidence, the Court finds that OOD's denial of funding for Plaintiff's participation in the KAP was improper.  It is clear that Plaintiff's request was mishandled at every stage of the process, as OOD's actions flew in the face of the Rehabilitation Act under which the OOD exists to serve Ohio's disabled citizens.  It is also abundantly clear to the Court that the OOD's denial of funding for the KAP was not actually based on what was vocationally necessary for Plaintiff, as the OOD officials' words and actions consistently exposed how little they understood about Plaintiff's ASD.

That said, before the Court addresses its substantive analysis, it must first address OOD's threshold argument that this case should be dismissed as moot.

## A.    This Case Is Not Moot.

As a preliminary matter, OOD argues that Plaintiff is not entitled to his requested relief for two basic reasons:  first, Plaintiff now receives funding for the KAP through Kentucky's VR program, so has no standing to challenge the relevant policy; and second, Plaintiff is not entitled to reimbursement because the Eleventh Amendment bars monetary damage awards against OOD as an agency or instrumentality of Ohio.  (ECF No. 64 at PAGEID # 1315.)  The Court will discuss each argument in turn.

12

1.      **Plaintiff Has Standing to Challenge OOD's Post-Secondary Training Policy.**

First, OOD argues that "because [Plaintiff] now receives funding for the KAP through

Kentucky's VR program, there is no need to even address his claims regarding the hearing

examiner's decision or his IPE." (ECF No. 64 at PAGEID # 1315.) Extending this argument,

OOD submits that Plaintiff has no standing and cannot challenge OOD's Post-Secondary

Training Policy. (*Id.*)

OOD's argument is not well taken. Whether Plaintiff has received funding for the KAP

from another source in subsequent semesters has no bearing on Plaintiff's present claim, which is

that OOD should have provided funding for the KAP for Plaintiff's first three years at WKU.

(ECF No. 63 at PAGEID # 1126 n.19 ("Without support from Defendants, Hunter has been

forced to rely on financial contributions from his parents to attend the Kelly Autism Program for

the past three years.").) Plaintiff expressly "does not seek reimbursement for fees paid on his

behalf by the Kentucky VR agency." (*Id.*) Plaintiff's receipt of support from the Kentucky VR

agency therefore does nothing to remove the "actual, ongoing controvers[y]" between Plaintiff

and OOD. *Honig v. Doe*, 484 U.S. 305, 317 (1988) ("Under Article III of the Constitution this

Court may only adjudicate actual, ongoing controversies."). Plaintiff's grievance against OOD is

identical now to what it was at the beginning of this lawsuit, as Plaintiff has always sought for

OOD to "reimburse [Plaintiff] for the payments [Plaintiff] made for the KAP." (ECF No. 1 at

PAGEID # 23.)

As for OOD's argument that Plaintiff cannot challenge OOD's Post-Secondary Training

Policy or seek to amend his IPE, the Court finds that Plaintiff has demonstrated a concrete harm

or threat of harm sufficient to sustain his challenge. *Morrison v. Bd. of Educ. of Boyd Cnty.*, 521

F.3d 602, 608 (6th Cir. 2008) ("To avoid conferring standing by way of guesswork, we require

that a litigant demonstrate either a concrete harm or the threat of such harm.").  Specifically,

Plaintiff has demonstrated that OOD has failed to comply with the Rehabilitation Act and

continues to do so in dealing with him and that OOD has wrongfully denied him educational

funding.  Plaintiff also has demonstrated that without the declaratory relief Plaintiff seeks, OOD

could continue to harm Plaintiff in the future (if, for example, Plaintiff pursues a postgraduate

degree and seeks KAP funding from OOD).  (*See* ECF No. 65 at PAGEID # 1344.)

Accordingly, Plaintiff's claims for declaratory relief are not moot.

> **2.    Plaintiff Does Not Seek Damages Against the State, but OOD Has Waived Any Eleventh Amendment Immunity Defense Regardless.**

OOD also argues that "[t]he Eleventh Amendment bars this Court from granting

[Plaintiff] reimbursement for the funds he already expended on KAP participation."  (ECF No.

64 at PAGEID # 1318.)  As Plaintiff correctly observes, however, he seeks equitable

reimbursement that would "merely require[] Defendants to belatedly pay expenses for delivery

of services that they should have delivered and paid all along, and would have borne in the first

instance had they developed a proper IPE for [Plaintiff]."  (ECF No. 65 at PAGEID ## 1340-

1341.)  The Court agrees, and finds Plaintiff's case law in support to be on point and persuasive.

Specifically, in *Sch. Comm. of the Town of Burlington v. Dep't of Educ. of Mass.*, 471

U.S. 359 (1985), the Supreme Court of the United States held that IDEA – which, as discussed

above, contains identical language to the Rehabilitation Act's provision that the Court "shall

grant such relief as [it] determines to be appropriate" in cases brought under 29 U.S.C. §

722(c)(5)(J)(ii) – "confers broad discretion on the court" and that "equitable considerations are

relevant in fashioning relief."  *Id.*, 471 U.S. at 360, 374.  Specifically, the Court held that this

grant of authority "includes the power to order school authorities to reimburse parents for their

expenditures . . . ."  *Id.* at 360.  The Supreme Court expressly rejected OOD's argument that such

reimbursement would constitute damages, holding as follows:

> In this Court, **the Town repeatedly characterizes reimbursement as "damages,"**
> **but that simply is not the case. Reimbursement merely requires the Town to**
> **belatedly pay expenses that it should have paid all along and would have borne**
> **in the first instance** had it developed a proper IEP. Such a *post hoc* determination
> of financial responsibility was contemplated in the legislative history . . . .

*Id.* at 370-371 (emphasis added).  This remains the law of the land, and has been extended to the

Rehabilitation Act's identical language as well.  *See Florence Cnty. Sch. Dist. Four v. Carter By*

*& Through Carter*, 510 U.S. 7, 16 (1993) ("Courts fashioning discretionary equitable relief

under IDEA must consider all relevant factors, including the appropriate and reasonable level of

reimbursement that should be required."); *Millay v. Maine*, 986 F. Supp. 2d 57, 76 (D. Me.

2013), *aff'd sub nom. Millay v. Maine Dep't of Lab., Bureau of Rehab., Div. for Blind & Visually*

*Impaired*, 762 F.3d 152 (1st Cir. 2014) ("Plaintiff is entitled to equitable reimbursement

equivalent to the amount he would have received from the DBVI had it not rejected his

request.").

Against this long line of authority, OOD's cases are unpersuasive because they answer a

different question.  Rather than addressing whether Plaintiff's desired relief constitutes

"damages," OOD merely assumes that it does and then argues the uncontested issue of whether

damages are allowed under the Rehabilitation Act.  (*See* ECF No. 64 at PAGEID # 1316

(Arguing that "[t]he Fifth Circuit has already concluded that damages are not available in actions

initiated pursuant to § 722(c)(5)(J)" and "[t]he Sixth Circuit recently discussed whether damages

are available . . . and concluded that they were not.") (internal citations omitted).)  Even

assuming, without deciding, that OOD was correct in this position, the Court still must decide

whether Plaintiff seeks damages in this case.  Courts across the country have spoken decisively,

and consistently, on this issue.  OOD's Opposition fails to persuade this Court not to extend the

Supreme Court's holding in *Town of Burlington* to the present case.  Accordingly, the Court

concludes that Plaintiff's request for equitable reimbursement is not an impermissible request for

damages; it is simply a request that OOD pay expenses that it should have paid all along and

would have borne in the first instance.  *Town of Burlington*, 471 U.S. at 370-371.

Even assuming, *arguendo*, that the Court disagreed with Plaintiff and found that Plaintiff

was indeed seeking damages, the Court nevertheless agrees with Plaintiff that OOD has waived

any Eleventh Amendment immunity it might otherwise have had.  To this end, it is well

established that a party can waive Eleventh Amendment immunity by voluntarily appearing and

defending a case on its merits:

> A state can waive its sovereign immunity through its litigation conduct—i.e., by
> "appearing without objection and defending [the suit] on the merits." [*Ku v. State
> of Tenn.*, 322 F.3d 431, 435 (6th Cir. 2003)]; [*Nair v. Oakland Cty. Comm. Mental
> Health Auth.*, 443 F.3d 469, 476 (6th Cir. 2006)] (sovereign immunity "may be
> altered by the parties' litigation conduct"); *Lawson v. Shelby Cty., Tenn.*, 211 F.3d
> 331, 334 (6th Cir. 2000) ("Consent may also take the form of a voluntary
> appearance and defense on the merits in federal court." (citation omitted)); *cf.* [*Wis.
> Dept' of Corr. v. Schacht*, 524 U.S. 381, 390, 118 S.Ct. 2047, 141 L.Ed.2d 364
> (1998)].

*Plain Loc. Sch. Dist. Bd. of Educ. v. DeWine*, 486 F. Supp. 3d 1173, 1187 (S.D. Ohio 2020),

*appeal dismissed,* No. 20-4088, 2020 WL 9216634 (6th Cir. Oct. 29, 2020).  That is exactly what

OOD has done here, and the Court does not find OOD's eleventh-hour suggestion of immunity

to be well taken.  *Barachkov v. Davis*, 580 F. App'x 288, 299 (6th Cir. 2014) ("[A] state waives

its sovereign immunity where its dilatory assertion of immunity is a 'tactical decision.'")

(quoting *In re Bliemeister,* 296 F.3d 858, 862 (9th Cir. 2002)) (citing *Hill v. Blind Indus. &

Servs. of Md.,* 179 F.3d 754, 763 (9th Cir.1999) ("The Eleventh Amendment was never intended

to allow a state to appear in federal court and actively litigate the case on the merits, and only

later belatedly assert its immunity from suit in order to avoid an adverse result."); *Lapides v. Bd.

of Regents of the Univ. Sys. Of Ga.,* 535 U.S. 613, 620 (2002) (characterizing a purpose of the

doctrine constructive-waiver doctrine as prohibiting states from selectively using immunity "to achieve litigation advantages")).

OOD has had a number of opportunities to assert this affirmative defense, but declined to do so until its Opposition. To be clear, Plaintiff requested this relief in his Complaint, so OOD had been on notice of the request for over two-and-a-half years prior to filing its Opposition. (ECF No. 1 at PAGEID # 23 ("Plaintiff respectfully requests this Court to . . . Order OOD to reimburse [Plaintiff] for the payments he made for the Kelly Autism Program").) Yet OOD did not assert Eleventh Amendment immunity in its Answer. (*See* ECF No. 15.) Nor did it assert Eleventh Amendment immunity in either of its two Rule 26(f) Reports. (*See* ECF Nos. 10, 29.) Nor did it assert Eleventh Amendment immunity in conjunction with Defendant Miller's motion to dismiss. (*See* ECF Nos. 13.)

Perhaps the most obvious evidence of OOD's waiver, however, is the fact that OOD remained silent on the issue even after the Plaintiff expressly briefed the issue of Eleventh Amendment immunity, as the Court acknowledged in its March 31, 2020 Opinion and Order denying Defendant Miller's motion to dismiss:

> As for the jurisdictional issue, **Plaintiff notes that the Court may later need to analyze Eleventh Amendment immunity as it applies to appeals under the Rehabilitation Act**, and Plaintiff cites to district courts that have dismissed similar appeals for lack of subject matter jurisdiction where the complaint was filed solely against the state agency and not also against the agency director in his or her official capacity.

(ECF No. 24 at PAGEID # 762 (emphasis added); *see also* ECF No. 20 at PAGEID ## 727-728 ("Still, the Court must ensure that it has subject-matter jurisdiction over the matter, which may include the applicability of the Eleventh Amendment and the exceptions to Eleventh Amendment immunity.").) Indeed, in denying Defendant Miller's motion to dismiss, the Court echoed at some length Plaintiff's discussion of Eleventh Amendment immunity, and noted that

17

"Defendants . . . did not respond to this argument."  (*Id.* at PAGEID ## 763-764.)  Yet even after

this implicit invitation to assert Eleventh Amendment immunity and brief the issue, OOD never

did so.  As a result, the Court observes that Defendants were the ***only*** participants in this case ***not***

to have raised and discussed Eleventh Amendment immunity for the first two-and-a-half years of

the case.

Having reviewed OOD's litigation conduct in this case, the Court concludes that OOD

manifested a clear intent to defend this action on its merits, without asserting an immunity

defense.  *Plain Loc. Sch. Dist. Bd. of Educ.*, 486 F. Supp. 3d at 1191.  ODD waited until

December 13, 2021 to assert the defense for the first time in response to Plaintiff's Merit Brief.

Given the individualized circumstances of this case, the Court is hard-pressed to reach any other

conclusion than that OOD's eleventh-hour invocation of immunity is nothing more than a

tactical decision made to prevent the Court from ruling on the merits of this case.  *Id.* at 1193.[5]

The waiver doctrine exists to prevent such gamesmanship, and the Court does not hesitate to find

that OOD waived its defense of immunity in this action.  *Barachkov*, 580 F. App'x 288, 299 (6th

Cir. 2014) ("Waiver doctrine thus prevents the state from gaining an unfair litigation advantage

by prohibiting a state from testing the waters with respect to the merits of its claim only to assert

sovereign immunity once it believes its claim will fail.").

---

[5] As that court found:

> The point of waiver by litigation conduct is to prevent the entity from agreeing to
> permit  a court to render a decision on the merits—so long as it feels it will win on
> the merits—and then belatedly changing course and asserting sovereign immunity
> as a tactical decision when it begins to feel the tide of litigation changing against it.
> . . .  That is especially true in instances, like here, where the defense is first asserted
> after the entity is able to see the strength of the plaintiffs' claim on the merits, when
> the plaintiffs' trial brief has been submitted, and the only remaining step is for the
> Court to actually issue its ruling on that claim.

*Plain Loc. Sch. Dist. Bd. of Educ.*, 486 F. Supp. 3d at 1193.

Accordingly, having found that Plaintiff has standing to pursue this action and that OOD is not entitled to Eleventh Amendment immunity, the Court will proceed to evaluating the merits of this action.

**B.    The Hearing Officer's Report and Recommendation Is Entitled to No Deference.**

From a substantive perspective, the parties' first critical disagreement is over the degree of deference to which the Hearing Officer's Report and Recommendation is entitled. (*Compare* ECF No. 63 at PAGEID ## 1129-1131 (Plaintiff arguing that it "should be given no deference") *with* ECF No. 64 at PAGEID ## 1318-1321 (OOD arguing that it "was sufficient" and "is due appropriate deference").) Here, despite the modified de novo standard of review applicable to this case, the Court finds that the Hearing Officer's Report and Recommendation was not supported by substantive findings and does not, on its face, rest on any applicable legal standards. Accordingly, it is flatly unreasonable and is not entitled to any deference by this Court. *C.K. by & through S.R. v. Bd. of Educ. of Sylvania City Sch. Dist.*, No. 3:19 CV 2753, 2021 WL 463187, at *11 ("[B]ecause the [hearing officer's] opinion rests on inaccurate and inapplicable legal standards, her opinion regarding ESY services is not due any deference and can be set aside by this Court."); *Burilovich*, 208 F.3d at 567 ("A court should defer to the administrative findings only when educational expertise is relevant to those findings and the decision is reasonable.").

Under the Rehabilitation Act and applicable Ohio law, the Hearing Officer was required to include "conclusions of law" in the Report and Recommendation which were based on "State regulations and policies that are consistent with the Federal requirements." 29 U.S.C. § 722(c)(5)(A). OOD argues that these provisions do not "require[] the hearing examiner to make his or her conclusion in any particular manner or make any specific findings," but rather "those provisions set only the bare minimum that a hearing examiner must consider when rendering his

or her decision." (ECF No. 64 at PAGEID # 1319.) OOD argues that the subject Report and

Recommendation "more than met that standard," because the Hearing Officer discussed the

testimony and evidence he found to be persuasive. (*Id.* at PAGEID ## 1319-1320.) OOD

concludes that "though [Plaintiff] is dissatisfied with the analysis done by the hearing examiner,

the decision provides all the detail necessary for the parties and this Court to understand the basis

for the decision." (*Id.* at PAGEID # 1320.)

The Court disagrees. Over the 36-page Report and Recommendation, Hearing Officer

Izzo never applied the relevant law to the facts before him which was a critical oversight,

especially given his obligation to provide "conclusions of law." At most, and only through the

most generous lens, Hearing Officer Izzo devoted the following four paragraphs in his

"DISCUSSION AND CONCLUSIONS OF LAW" section to a "discussion" of the applicable

law:

> The undersigned does not believe OOD's rules or policies contradict Federal Law.
> OOD must provide an explanation of its guidelines and criteria associated with
> financial commitments concerning an individualized plan for employment…" *See*
> U.S.C. 722(b)(1)(C)(i). The Rehabilitation Act of 1973, as amended, took into
> account that state units such as OOD would have certain guidelines or criteria that
> would affect the IPE.

> OOD is bound to follow Ohio and Federal Law. Ohio law, and the rules
> promulgated thereunder, are presumed compliant with the Ohio and U.S.
> Constitutions. *See* R.C. 1.47. When interpreting statutes, courts must give due
> deference to an administrative interpretation formulated by an agency that has
> accumulated substantial expertise, and to which the General Assembly has
> delegated the responsibility of implementing the legislative command. *See State,
> ex rel. McLean, v. Indus. Comm.* (1986), 25 Ohio St.3d 90, 25 [sic]. An
> administrative rule that is issued pursuant to statutory authority has the force of law
> unless it is unreasonable or conflicts with a statute covering the same subject matter.
> *See State ex rel. Celebrezze v. Natl. Lime & Stone Co.*, 68 Ohio St.3d 377, 627
> N.E.2d 538 (1994). Similar deference should be given to formally implemented
> policies.

> OOD is the state unit authorized under the Rehabilitation [A]ct of 1973, 29 U.S.C.
> 701, as amended, to provide vocational rehabilitation services to eligible
> individuals with disabilities. [Plaintiff] is an eligible individual with a disability.

OOD is to provide vocationally necessary or disability services. An IPE is developed to address these services. At the time [Plaintiff's] IPE was developed the KAP was not listed. However, that is not necessarily determinative because it is the undersigned's understanding that an IPE can be modified as necessary.

The question now becomes, are the services provided by the KAP vocationally necessary?

(ECF No. 11 at PAGEID ## 83-84.)  This is not, however, a discussion of the applicable law; it is a basic summary of the OOD's obligations to apply the law.  And while the Hearing Officer eventually got to the critical legal question – "are the services provided by the KAP vocationally necessary?" – he failed to take the necessary next step to properly answer that question.  At that point, Hearing Officer Izzo should have discussed what "vocationally necessary" means under the Rehabilitation Act, what Plaintiff's individual vocational needs were, and whether the KAP was vocationally necessary for Plaintiff in light of those individual needs.  But he did not do so.

To this end, the Report and Recommendation's greatest flaw is the Hearing Officer's failure to discuss Plaintiff's vocational needs.  Without appropriately discussing Plaintiff's disability and his individual needs, it is impossible to reach any defensible conclusion regarding whether a certain program is vocationally necessary.  And yet the Hearing Officer largely ignored these critical facts.  Specifically, over the 36-page Report and Recommendation, the Hearing Officer only discussed Plaintiff's disability three times, and only mentioned that Plaintiff desires to be a graphic designer twice – and only ever in passing:

- ECF No. 11 at PAGEID # 53:  "He is diagnosed with autism, and a little AD/HD" and "[his] goal is to be a graphics designer";

- *Id.* at PAGEID # 64:  "[Plaintiff] was diagnosed with autism around the age of four";

- *Id.* at PAGEID # 64:  "[Plaintiff] was diagnosed with Asperger's Syndrome and Attention Deficit Hyperactivity Disorder, Combined type, in November of 2005"; and

- *Id.* at PAGEID # 67:  "[Plaintiff's] employment goal is as a graphic designer."

21

This was as deep as Hearing Officer Izzo's discussion went, as the Report and Recommendation is conspicuously silent on any further details regarding Plaintiff's disability or his vocational goal.

Under the Rehabilitation Act, the OOD must ensure that provision of services is "based on the rehabilitation needs of each individual," and it "may not establish any arbitrary limits on the nature and scope of [VR] services." 34 C.F.R. § 361.50(a). The OOD must also ensure that VR services are available to assist the disabled individual "in preparing for, securing, retaining, advancing in or regaining an employment outcome that is **consistent with the individual's unique strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice**[.]" 34 C.F.R. § 361.48(b) (emphasis added). This mandate plainly reflects the realities that no two disabilities are exactly the same and each person has individualized vocational goals. Accordingly, VR services are not, and cannot be, "one size fits all."

But this is where the Hearing Officer's Report and Recommendation fails (and where the OOD has consistently failed Plaintiff since Plaintiff first sought support for the KAP program in June 2018, as discussed below). Instead of discussing Plaintiff's "unique strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice," Hearing Officer Izzo simply summarized cherry-picked testimony and evidence, reached general findings such as "OOD determined all of the services provided by KAP were not vocationally necessary" and "OOD made a decision that the program was not necessary," and then concluded that "OOD proved it is more likely than not that the KAP program is not vocationally necessary." (*Id.* at PAGEID ## 84-86.) The Hearing Officer noted that an OOD witness "raised the issue of desires or needs," but did not explain *what* Plaintiff's desires or needs were – let alone how the KAP did,

or did not, address them. (*Id.* at PAGEID # 85.) And Hearing Officer Izzo conspicuously

provided no legal authority on which he could ground his conclusions, because none exists.

      In short, because Hearing Officer Izzo's conclusions do not rest on any applicable legal

standards, his Report and Recommendation is unreasonable, not due any deference, and can be

set aside by this Court. *C.K.*, 2021 WL 463187, at *11 ("[B]ecause the [hearing officer's]

opinion rests on inaccurate and inapplicable legal standards, her opinion regarding ESY services

is not due any deference and can be set aside by this Court."); *Burilovich*, 208 F.3d at 567 ("A

court should defer to the administrative findings only when educational expertise is relevant to

those findings and the decision is reasonable.").

## C.    The OOD's Denial of Support Constituted an Unlawful Arbitrary Limit on Services.

      The Court's above finding, that the Report and Recommendation is entitled to no

deference, does not end the discussion. It simply means the Court must review the OOD's

actions to determine whether its refusal to support the KAP was legal. Put differently, the Court

must determine whether the OOD's Post-Secondary Training Policy (the "PST Policy") is an

"arbitrary limit[] on the nature and scope of [VR] services." 34 C.F.R. § 361.50(a). On this

point, Plaintiff argues that the OOD's denial was an improper "arbitrary limit" because the OOD

misinterpreted the PST Policy and failed to consider Plaintiff's actual needs. (*See* ECF No. 63 at

PAGEID ## 1138-1141.) Plaintiff submits that "the *only* justification for denying support that

was ever provided to [Plaintiff] or found in the case file was that 'the agency does not support

such programs as the [KAP],'" and that the OOD improperly denied support given a lack of

"extraordinary circumstances," not Plaintiff's demonstrated need as required by law. (*Id.*) On

the other hand, OOD argues that the PST Policy itself is not arbitrary, and that "the record

establishes that OOD based its decision to deny funding for the KAP after determining that it

was not vocationally necessary for [Plaintiff]." (ECF No. 64 at PAGEID ## 1321-1324.)

The Court disagrees with OOD, as the record clearly demonstrates how the OOD repeatedly based its on denial of support on arbitrary factors which were unrelated to what was vocationally necessary for Plaintiff.  First, for example, on June 26, 2018, Mr. Trevino summarily informed Plaintiff that OOD "does not support such programs as the [KAP]," without any explanation. (ECF No. 11 at PAGEID ## 195, 292.)  On July 5, 2018, after Plaintiff's father asked for the "reason why the request for the [KAP] was denied," Mr. Trevino replied that "[i]t is written in policy that the agency does not support such programs."  (*Id.* at PAGEID # 186.)  Mr. Trevino further wrote that "VR staff shall not authorize for disability services or programs that are not required for an educational school or institution to provide without supervisor approval" and "[t]his includes programming for specialized disability populations with a separate fee associated."  (*Id.*)  Six months later, Mr. Trevino again denied Plaintiff's request for funding, and again explained that "[t]he reason we are unable to support the [KAP] is that the agency's post-secondary policy states that a counselor will not authorize for specialized disability populations with a separate fee associated."  (*Id.* at PAGEID # 166.)

During the administrative hearing, Mr. Trevino testified that these initial denials came after conversations with his supervisor, since the PST Policy required supervisor approval.  (*Id.* at PAGEID ## 620-621.)  Mr. Trevino confirmed that, because he and his supervisor did not know of any "exceptions," they could not approve Plaintiff's request.  (*Id.*)  David Sullivan, Mr. Trevino's supervisor, confirmed this during the administrative hearing, testifying that the PST Policy "indicates that VR counselors are to go to their supervisors to see if any kind of an exception can be made."  (*Id.* at PAGEID # 541.)  But instead of discussing Plaintiff's disability, his vocational goals, and his actual needs, Mr. Sullivan and Mr. Trevino limited their evaluation of Plaintiff's request to whether they "had heard of any situations where [OOD] had made an

24

exception" before.  (*Id.* at PAGEID ## 555-556.)  Indeed, Mr. Sullivan testified that he contacted

other OOD officials "to see if they had heard of any situations where we had made an

exception," and he ultimately concluded that Plaintiff's request should be denied because the

other OOD officials "both said that they had not heard of [any exceptions]." (*Id.*)  Mr. Trevino

testified that because he believed that no exceptions had been made before, "we didn't see a need

for this one to be the exception." (*Id.* at PAGEID # 631.)

Upon closer examination, Mr. Trevino confirmed that there was no substantive reason or

support for denying Plaintiff's request, and that it was merely a matter of procedure:

> Q:   Sure. Was there any other reason provided by your supervisor for denying
>      the program?
>
> A.   I believe it was just that those types of programs aren't currently something
>      that OOD looks to help out with, due to policy. And that, you know, they
>      used to have a past -- I mean, as far as why my supervisor would tell me –
>      **I believe, it was just according to policy. I don't think it was any outside
>      reasoning.**
>
> ***
>
> Q:   All right. And **were there any other justifications provided -- any other
>      reasons for the denial other than what you wrote?**
>
> A:   **No.**

(*Id.* at PAGEID ## 632-633, 637 (emphasis added).)  Mr. Sullivan's testimony was

overwhelmingly consistent on this point:

> Q:   Was there any discussion about [Plaintiff's] need for the types of services?
>
> A:   I believe so, but, yeah, I think we talked about it some, but, you know, **the
>      bottom line was that we had to follow policy.**
>
> ***
>
> Q:   So back to discussing a post-secondary education policy, you mentioned
>      that OOD has not, did not see a reason for making exceptions. **Is there any
>      type of document or other policy that provides guidance on when these
>      types of programs should be funded?**

A:     **Not that I'm aware of.**

Q:     Okay.

A:     I don't think there is.

\*\*\*

Q:     . . . What information did OOD attempt to gather from the [KAP] in order to determine whether the services were necessary?

A:     So, again, you know, **in making our decision, you know, it wasn't all about is it necessary or not, it's whether or not we can pay for it. And per the policy we were not able to and that's how the decision was made.**

(*Id.* at PAGEID ## 558, 561, 566-567 (emphasis added).)

By arbitrarily limiting their decisionmaking to their own interpretation of the PST Policy, Mr. Trevino and Mr. Sullivan failed to consider, let alone research, the services provided by the KAP. Mr. Trevino, for example, testified that he "only knew very limited about KAP" when he denied Plaintiff's request, because "our policy doesn't really allow for us as counselors to just jump into authorizing for it anyway." (*Id.* at PAGEID # 604.) Mr. Trevino also testified that he never spoke with Plaintiff about any of the services KAP provided which Plaintiff "might need to address some of [his] challenges." (*Id.* at PAGEID # 618.) For his part, Mr. Sullivan went so far as to testify that he did not even investigate the KAP before concluding that an exception could not be made for Plaintiff:

Q:     So when you were considering whether an exception should be made in this case, **did you investigate the certifications and the licensures for this program**?

A:     **I did not.** You know, **I really felt, like I said before, that, you know, I needed to follow policy** on this and that we shouldn't be paying for this program.

\*\*\*

Q:     Okay. No problem. All right. So are you familiar with when you consulted with [Mr. Trevino], did you discuss the specific services that the [KAP] provides in detail?

26

A:      Well, that was back in June. I think we talked about them in general. **I don't think we went through all the specifics of the program.**

(*Id.* at PAGEID # 562, 565 (emphasis added).)  Accordingly, and notwithstanding Mr. Sullivan's own opinion that the KAP could benefit Plaintiff and address Plaintiff's actual needs, Mr. Sullivan testified that "the decision was based on following policy." (*Id.* at PAGEID # 572 ("And, you know, I think, again [the KAP] has benefit, it addresses needs, but, again, the decision was based on following policy.").)

Given this overwhelming evidence, the Court flatly rejects OOD's suggestion that "the record establishes that OOD based its decision to deny funding for the KAP after determining that it was not vocationally necessary for [Plaintiff]." (ECF No. 64 at PAGEID # 1321.)  To the contrary, Mr. Trevino and Mr. Sullivan repeatedly confirmed that the decision was made pursuant to their own interpretations of the PST Policy, which arbitrarily led them to conclude that an exception could not be made for Plaintiff because they were unaware of exceptions having been made before.  Put simply, there was no meaningful analysis of whether the KAP was vocationally necessary for Plaintiff, because Mr. Trevino and Mr. Sullivan believed that "the bottom line was that we had to follow policy." (ECF No. 11 at PAGEID # 558.)

If there had been such an analysis, the Court believes it would not have taken long for the OOD to determine that the KAP was vocationally necessary for Plaintiff.  First, for example, while the OOD officials repeatedly took issue with the "socials" component of the KAP (without any legal support to do so),[6] they failed to consider that it could be vocationally necessary for

---

[6] As Plaintiff correctly observes, OOD can support programs which help develop necessary "social" skills.  *See e.g.*, 34 C.F.R. § 361.48(b)(6) ("training" includes personal adjustment training); ECF No. 11 at PageID 329 ("personal adjustment training" is defined by OOD as "acquiring personal habits, attitudes and skills *(including social skills)* needed to function effectively on the job"); 34 C.F.R. § 361.48(a)(2)(iv) (workplace readiness training helps "develop social skills and independent living"); State VR and Supported Employment Services Programs, 81 Fed. Reg. 55630, 55695 (Aug. 19, 2016) (development of social skills

Plaintiff to take advantage of such programs. (*See* ECF No. 11 at PAGEID # 83.) This oversight is particularly surprising given that the record repeatedly demonstrates Plaintiff's vocational need to improve his communication and social skills. First, for example, Plaintiff's IEP noted that "[s]ome of his weaknesses are in social and emotional behavior," that Plaintiff "ha[s] communication needs" and that Plaintiff "needs to recognize his communication differences and engage in activities/discussions regarding how such differences may be perceived by others as well as changes he can make to reduce these differences including advocating for his need to use his calming strategies." (*Id.* at PAGEID ## 263-264.) Additionally, an Evaluation Team Report ("ETR") from Plaintiff's senior year of high school indicated that "[s]ome of his challenges are regulating his emotions, stress management, handling unexpected situations, and communication issues with peers," as well as "social/emotional relationships and behavior." (*Id.* at PAGEID ## 277-278.) The ETR also noted that "[a]ccommodations that have helped [Plaintiff] in the past are as follows: Preferential seating close to door and away from noisy or disruptive peers, cue to utilize Calm Down list, [and] breaks to calm down in the hallway." (*Id.*)

Consistent with these records, Plaintiff's IPE – which Plaintiff completed with Mr. Trevino – listed a number of steps which were "needed to reach [Plaintiff's] employment goal, including "Job interviewing skills," "Job Search," "Job Retention," and "Attend and finish college courses." (*Id.* at PAGEID # 297.) All of these steps directly implicate Plaintiff's communication and social skills. Despite Mr. Trevino indelicately describing Plaintiff as

---

includes "communication and interpersonal skills" and "other 'soft' skills necessary for employment"); 34 C.F.R. § 361.5(c)(37)(v)(D) (definition of "ongoing support services" includes "social skills training"); Rehabilitation Services Administration, *Instructions for Completion of the Case Service Report (RSA-911)*, Attachment II - p.18 (May 6, 2019), https://rsa.ed.gov/sites/default/files/subregulatory/pd-19-03.pdf ("job readiness training" is defined as "training provided to prepare an individual for work (e.g., work behaviors, interpersonal communication skills . . . ")).

"hav[ing] some social quirks," no one at OOD ever considered whether it was vocationally necessary for Plaintiff to enroll in programs which would help improve these skills.  In the Court's view, this is particularly inexcusable after Plaintiff's first semester as WKU, at which time Mr. Trevino noted the KAP counselor's belief that Plaintiff "would benefit from socializing more" and that Plaintiff "does not believe that he has time to socialize outside of the [KAP] group."  (*Id.* at PAGEID # 307; *see also id.* at PAGEID ## 168-169 ("[Mr. Trevino] stated that the [KAP] program sounds like it is beneficial to [Plaintiff]").)  And beyond that, it is impossible to reconcile OOD's refusal to consider whether the KAP's social programs were vocationally necessary for Plaintiff with Mr. Trevino's own testimony that "soft" social skills and communication skills were "the types of things that OOD wants to ensure that its participants have going into the workforce."  (*Id.* at PAGEID ## 645-646.)

This kind of arbitrary decision-making, completely detached from Plaintiff's actual goals or vocational needs, is precisely what the Rehabilitation Act forbids.  On this point, the Court finds Plaintiff's reliance on *Schornstein v. New Jersey Div. of Vocational Rehab. Servs.*, 519 F. Supp. 773 (D.N.J. 1981), *aff'd*, 688 F.2d 824 (3d Cir. 1982), to be apt.  Just as here, where Mr. Trevino and Mr. Sullivan believed that the PST Policy provided them with discretion to deny services such as the KAP, in *Schornstein* the New Jersey VR agency argued that "the services which it provides to any of its clients are within its sole discretion."  *Schornstein*, 519 F. Supp. at 779.  In rejecting this argument, the district court analyzed the "mandatory nature" of the Rehabilitation Act, and concluded that "an agency which receives federal funds under Title I [of the Rehabilitation Act] must provide its clients with at least those services enumerated in section 103(a) which are necessary to the achievement of vocational goals."  *Id.* at 779-780.  Similarly, in *Scott v. Parham*, 422 F. Supp. 111 (N.D. Ga. 1976), the district court held that a state policy

29

which provided support only to those individuals receiving vocational rehabilitation who lived

independently was unreasonable because "the application of such a rule across the board fails to

account for particularized cases of need." *Scott*, 422 F.Supp. at 113; *see also Marshall v.*

*Switzer*, 900 F. Supp. 604, 614 (N.D.N.Y. 1995) ("These two cases illustrate the fact that the

Rehabilitation Act established a right to the provision of individualized services.").  The same is

unavoidably true here, as OOD's arbitrary denial of support was completely detached from any

analysis of what individualized services would be vocationally necessary for Plaintiff.

     While the Court does not hesitate in concluding that the record before the Hearing Officer

was more than sufficient to find that OOD's denial of support was unlawful, Plaintiff's argument

has only strengthened on appeal to this Court, as Plaintiff has been able to supplement the record

with evidence which the Hearing Officer chose not to consider.[7]  (*See* ECF No. 25.)

Specifically, Plaintiff has provided additional evidence which directly addresses one of the

weaknesses in Plaintiff's case as it was presented to the Hearing Officer – the fact that "there

was no data to show the success rate of the career development program."  (ECF No. 11 at

PAGEID # 85.)  This evidence confirms that the KAP was  in fact successful, both in terms of

retention and in professional development.  For example, Plaintiff has shown that before the

KAP was developed, the retention rate for students with ASD was less than 25%, but in the past

five years the KAP has retained and graduated over 80% of its participants.  (*See* ECF No. 63-5

---

[7] The Court recognizes that the Hearing Officer was well within his authority to limit the number of witnesses who could appear at the Fair Hearing by telephone, as opposed to in person. While the Hearing Officer's decision on that issue is immune from this Court's review, the Court nevertheless feels obliged to comment on the inefficiencies and delays the Hearing Officer's decision had on the ultimate disposition of this case.  By denying Plaintiff the opportunity to present objective data and other evidence regarding the vocational success of the KAP, only to then deny Plaintiff's claim, in part, because "there was no data to show the success rate of the [KAP]," the Hearing Officer effectively forced Plaintiff to continue litigating his claim for three additional years, if Plaintiff wanted all of his evidence to be considered.

at PAGEID ## 1277-1278.)  Plaintiff also has shown, through the sworn declaration by the KAP Director, that every student who participated in the KAP and graduated with the same major as Plaintiff was employed in graphic design within one year of graduation.  (*Id.* at PAGEID # 1278.)  This information speaks not only to the success of the KAP, but also its necessity for students with ASD, in direct contradiction to the Hearing Officer's skepticism on these points.[8] And while the Court has not extended any deference to the Hearing Officer's Report and Recommendation, this new evidence provides the preponderance necessary to reverse the Report and Recommendation, even if the Court were inclined to extend such deference.

In sum, the overwhelming weight of evidence shows that the Hearing Officer committed reversible error by affirming the OOD's denial of support for the KAP.  The Hearing Officer failed to apply the relevant authority necessary to analyze whether a vocational necessity

---

[8] The Court also feels compelled to address the Hearing Officer's comment that "[w]ith other autistic students attending [WKU] but not in the KAP, it raises a question as to whether participation is a necessity."  (ECF No. 11 at PAGEID # 85.)  Unfortunately, this is in line with other statements throughout the record which reveal an unexpected lack of understanding of Plaintiff's conditions by various OOD officials.  (*See, e.g.,* ECF No. 11 at PAGEID ## 53 (The Hearing Officer describing Plaintiff as having "[a] little AD/HD"); 294 (Plaintiff's Comprehensive Assessment Form, completed by Mr. Trevino, which indicates that Plaintiff has "some social quirks").)  This perceived lack of empathy for individuals with disabilities is further reflected in, and perhaps stems from, statutory language which refers to individuals with disabilities as "consumers."  Regardless, the Court need not remind professionals responsible for the provision of vocational rehabilitation services for individuals with disabilities that ASD is not "one size fits all."

This all makes the Hearing Officer's comment regarding other autistic students at WKU so surprising, as the Hearing Officer inexplicably felt it was appropriate not only to group Plaintiff together with other students with ASD, for purposes of evaluating Plaintiff's vocational needs, but also to then use the other students with ASD as anecdotal evidence to support that the KAP was not vocationally necessary for Plaintiff.  This line of thinking is directly at odds with the spirit of the Rehabilitation Act, which requires an individualized determination of needs.  *See* 34 C.F.R. §§ 361.45(b), 361.50(a).  It also unfortunately reflects a concerning degree of misunderstanding regarding ASD.  Regrettably, the Hearing Officer's comment is consistent with the other OOD officials who, as discussed herein, arbitrarily evaluated Plaintiff's request without considering his actual goals, limitations, or vocational needs.

31

determination took place.  Such a determination did not take place, and the OOD's *post hoc*

attempts to comply with the Rehabilitation Act were both insufficient and improper.  Upon a

review of all of the evidence in the record, it is clear to the Court that OOD failed to meet its

burden to prove not only that their denial of Plaintiff's request was in accordance with law, but

also that the KAP was not vocationally necessary for Plaintiff.  The evidence confirms that the

KAP was vocationally necessary for Plaintiff.  The Hearing Officer's conclusions to the contrary

are against the weight of that evidence and contrary to law.

## V.  CONCLUSION

For the reasons stated above, the Hearing Officer's Report and Recommendation is

**REVERSED**, as Opportunities for Ohioans with Disabilities' decision to deny support for

Plaintiff's participation in the Kelly Autism Program, and the Hearing Officer's Report and

Recommendation affirming the same, violated the Rehabilitation Act and its implementing

regulations.  Opportunities for Ohioans with Disabilities is **ORDERED** to **REIMBURSE**

Plaintiff for payments made for the Kelly Autism Program at $5,000.00 per semester, and to

**AMEND** Plaintiff's Individualized Plan for Employment to include the Kelly Autism Program

as a vocationally necessary service for Plaintiff.  Opportunities for Ohioans with Disabilities is

**FURTHER ORDERED** to pay for all costs associated with this action.  The Clerk is

**DIRECTED** to enter **FINAL JUDGMENT** in favor of Plaintiff.

**IT IS SO ORDERED.**


Date: August 10, 2022                      */s/ Elizabeth A. Preston Deavers*
                                           **ELIZABETH A. PRESTON DEAVERS**
                                           **UNITED STATES MAGISTRATE JUDGE**